UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

MICHAEL JACOBS and
RUBY HANDLER-JACOBS,

Defendants.

**ORDER**

16 Cr. 800 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

On August 31, 2017, Michael Jacobs and Ruby Handler-Jacobs were charged in a superseding indictment with conspiracy to commit wire fraud, wire fraud, conspiracy to impersonate employees of the United States, impersonation of employees of the United States, aggravated identity theft, conspiracy to commit money laundering, and money laundering. ((S1) Indictment (Dkt. No. 105))

On February 2, 2018, Jacobs and Handler-Jacobs pled guilty to conspiracy to impersonate employees or officers of the United States in violation of 18 U.S.C. §§ 371 and 912. (Feb. 2, 2018, Min. Entries)

On May 17, 2018, this Court sentenced Jacobs to three years' imprisonment and three years' supervised release. (Dkt. No. 194) On September 14, 2018, this Court sentenced Handler-Jacobs to two years' imprisonment and three years' supervised release. (Dkt. No. 236)

On December 3, 2025, Jacobs and Handler-Jacobs filed a pro se motion requesting that this Court unseal docket entries 196, 230, and 238 and "all of the redacted victim statements and all related documents contained" therein. (Defs. Mot. to Unseal (Dkt. No. 331) ¶ 20) Defendants assert "that [docket entries 196, 230, and 238] are possible victim statements concerning Mrs. Handler-Jacobs or Mr. Jacobs." (Id. ¶ 6)

For the reasons stated below, Defendants' motion to unseal docket entries 196, 230, and 238 will be denied.

## BACKGROUND

## I. THE DEFENDANTS' CRIMINAL CONDUCT

Between June 2013 and December 2016, Michael Jacobs, his wife Ruby Handler-Jacobs, and their co-defendants participated in an audacious, highly complex, and utterly fraudulent investment scheme known as the "Cities Upliftment Program." (Jacobs Sent. Tr. (Dkt. No. 205) at 22; Handler-Jacobs Sent. Tr. (Dkt. No. 234) at 28)

The scheme was principally devised by co-defendant Rienzi Edwards, and was marketed to investors in the United States and abroad by Michael Jacobs and Ruby Handler-Jacobs, and their codefendants Lawrence Lester and Rachel Gendreau. (Jacobs Sent. Tr. (Dkt. No. 205) at 22; Handler-Jacobs Sent. Tr. (Dkt. No. 234) at 28; Jacobs PSR (Dkt. No. 181) ¶ 31; Handler-Jacobs PSR (Dkt. No. 182) ¶ 32) Michael Jacobs, Ruby Handler-Jacobs, and their co-defendants represented to potential investors that the Cities Upliftment Program would generate extremely high investment returns through a "trading program" operated by the New York Federal Reserve Bank, and that half of the returns would be used to help American cities impacted by the 2008 financial crisis. (Jacobs Sent. Tr. (Dkt. No. 205) at 23; Handler-Jacobs Sent. Tr. (Dkt. No. 234) at 28; Jacobs PSR (Dkt. No. 181) ¶¶ 26, 31; Handler-Jacobs PSR (Dkt. No. 182) ¶¶ 27, 32) Potential investors were told that if they invested $1 million in the scheme, their principal would generate returns of $2 million a day for 75 banking days. (Jacobs Sent. Tr. (Dkt. No. 205) at 23; Handler-Jacobs Sent. Tr. (Dkt. No. 234) at 28; Jacobs PSR (Dkt. No. 181) ¶ 32; Handler-Jacobs PSR (Dkt. No. 182) ¶ 33) The defendants also told investors that the investment program scheme was operated by the Federal Reserve Bank of New York, and that

the investments were secured by the U.S. Government through "sovereign guarantees." (Jacobs Sent. Tr. (Dkt. No. 205) at 23; Handler-Jacobs Sent. Tr. (Dkt. No. 234) at 29; Jacobs PSR (Dkt. No. 181) ¶¶ 26, 33; Handler-Jacobs PSR (Dkt. No. 182) ¶¶ 27, 34) Some investors were told that their returns would not be subject to U.S. income taxes, and certain foreign investors were told that they would receive green cards as a result of their investment. (Jacobs Sent. Tr. (Dkt. No. 205) at 23; Handler-Jacobs Sent. Tr. (Dkt. No. 234) at 29; Jacobs PSR (Dkt. No. 181) ¶ 33; Handler-Jacobs PSR (Dkt. No. 182) ¶ 34) All of these representations were lies.

In connection with the scheme, the defendants used forged and counterfeit New York Federal Reserve Bank documents and impersonated a real New York Federal Reserve Bank official. (Jacobs Sent. Tr. (Dkt. No. 205) at 23; Handler-Jacobs Sent. Tr. (Dkt. No. 234) at 29; Jacobs PSR (Dkt. No. 181) ¶ 34; Handler-Jacobs PSR (Dkt. No. 182) ¶ 35) Investors were provided with investment contracts, guarantees, and other correspondence on what appeared to be New York Federal Reserve Bank letterhead, and bearing the names and purported signatures of real New York Federal Reserve Bank officials. (Jacobs Sent. Tr. (Dkt. No. 205) at 23; Handler-Jacobs Sent. Tr. (Dkt. No. 234) at 29; Jacobs PSR (Dkt. No. 181) ¶ 34; Handler-Jacobs PSR (Dkt. No. 182) ¶ 35) All of these documents were fabricated.

In November 2013, early in the scheme, Jacobs, Handler-Jacobs, and co-defendant Edwards met with a potential investor in Hong Kong. Both Jacobs and Edwards pretended to be officials of the New York Federal Reserve Bank at this meeting. (Jacobs Sent. Tr. (Dkt. No. 205) at 23-24; Handler-Jacobs Sent. Tr. (Dkt. No. 234) at 29; Jacobs PSR (Dkt. No. 181) ¶ 40; Handler-Jacobs PSR (Dkt. No. 182) ¶ 41) Jacobs, Handler-Jacobs, and Edwards all knew that neither Jacobs nor Edwards was employed by the New York Federal Reserve Bank, but all three nonetheless represented at this meeting that Jacobs was Michael Alix, an actual New

York Federal Reserve Bank employee who was purportedly an authorized representative of the fictitious Cities Upliftment Program. (Handler-Jacobs Sentencing Br. (Dkt. No. 210) at 11; see also Handler-Jacobs Plea Tr. (Dkt. No. 158) at 27)

Jacobs, Handler-Jacobs, and their co-defendants also caused investors to sign bogus contracts that were typically countersigned by a purported official of the New York Federal Reserve Bank, and provided investors with wiring instructions to make their investments in the scheme. (Jacobs Sent. Tr. (Dkt. No. 205) at 24; Handler-Jacobs Sent. Tr. (Dkt. No. 234) at 30; Jacobs PSR (Dkt. No. 181) ¶ 36; Handler-Jacobs PSR (Dkt. No. 182) ¶ 37) Handler-Jacobs volunteered to pretend to be a purported assistant to Michael Alix when answering an anticipated phone call from a potential investor. (Govt. Sent. Br. re Handler Jacobs (Dkt. No. 219) at 3)

Jacobs and Handler-Jacobs also allowed corporate entities that they controlled to be used to facilitate the fraud, and incorporated a new company – Kingdom Trust – for this purpose. The name Kingdom Trust was chosen to sow confusion with respect to a legitimate trust company bearing the same name. (Jacobs Sent. Tr. (Dkt. No. 205) at 24; Handler-Jacobs Sent. Tr. (Dkt. No. 234) at 30; Jacobs PSR (Dkt. No. 181) ¶ 53; Handler-Jacobs PSR (Dkt. No. 182) ¶ 54)

Between December 2013 and December 2016, Jacobs, Handler-Jacobs, and their co-defendants caused investors in the fraudulent Cities Upliftment Program to wire more than $50 million to bank accounts that they controlled. (Jacobs Sent. Tr. (Dkt. No. 205) at 24; Handler-Jacobs Sent. Tr. (Dkt. No. 234) at 30; Jacobs PSR (Dkt. No. 181) ¶ 37; Handler-Jacobs PSR (Dkt. No. 182) ¶ 38)

Jacobs, Handler-Jacobs, and their co-defendants insured that nearly all of the fraud proceeds were quickly wired out of the United States to overseas bank accounts. Bogus

descriptions of the purpose of the wire transfers were provided to banks, including that the money would be used to support an overseas photo gallery project. Handler-Jacobs "helped create and sent to the banks false documentation to justify the overseas wire transfers, including documents in which she used the fake name 'Ann Jacques' ('Jacques' being the middle name of Michael Jacobs)." (Gov't Sent. Br. re Handler-Jacobs (Dkt. No. 219) at 4)

## II. PLEA AGREEMENTS

On January 22, 2018, Jacobs entered into a plea agreement, pursuant to which he agreed to plead guilty to conspiracy to impersonate employees or officers of the United States, in violation of 18 U.S.C. §§ 371 and 912. (Jacobs Plea Agmt. at 1)

On February 2, 2018, Handler-Jacobs entered into a plea agreement, pursuant to which she agreed to plead guilty to conspiracy to impersonate employees or officers of the United States, in violation of 18 U.S.C. §§ 371 and 912. (Handler-Jacobs Plea Agmt. at 1)

In their respective plea agreements, Jacobs and Handler-Jacobs "agree[d] to make restitution in an amount ordered by the Court in accordance with Title 18, United States Code, Section[s] 3663, 3663A, and 3664." (Jacobs Plea Agmt. at 1; Handler-Jacobs Plea Agmt. at 1) Defendants also stipulated that their offense involved ten or more victims and a loss amount between $9.5 million and $25 million. (Jacobs Plea Agmt. at 2; Handler-Jacobs Plea Agmt. at 2)

Jacobs and Handler-Jacobs further acknowledged in their plea agreements that they "accepted [the plea agreement] and decided to plead guilty because [they are] in fact guilty." (Jacobs Plea Agmt. at 4; Handler-Jacobs Plea Agmt. at 4) Both defendants expressly

> waive[d] any and all right to withdraw [their guilty] plea or to attack [their] conviction, either on direct appeal or collaterally, on the ground that the Government has failed to produce any discovery material, Jencks Act material, exculpatory material pursuant to Brady v. Maryland, 373 U.S. 83 (1963), other than information establishing the factual innocence of the defendant, or

> impeachment material pursuant to Giglio v. United States, 405 U.S. 150 (1972), that has not already been produced as of the date of the signing of this Agreement.

(Jacobs Plea Agmt. at 4; Handler-Jacobs Plea Agmt. at 4)

## III. THE PLEA PROCEEDINGS

On February 2, 2018, Jacobs and Handler-Jacobs appeared before the Court to plead guilty pursuant to their respective plea agreements. (Feb. 2, 2018, Min. Entries)

Before accepting the Defendants' guilty pleas, the Court confirmed that Jacobs and Handler-Jacobs had each read their plea agreements before signing them, discussed the plea agreements with their attorneys, understood the terms of their plea agreements, and signed their plea agreements voluntarily. (Plea Hearing Tr. (Dkt. No. 158) at 20:22-21:14, 22:3-22) The Court also confirmed that Jacobs and Handler-Jacobs understood that "as long as I sentence you to 60 months of imprisonment or less, you may not appeal your sentence or file any collateral challenge attacking the legality of your sentence." (Plea Hearing Tr. (Dkt. No. 158) at 21:22-22:2, 23:5-9)

As to their restitution obligations, the Court had the following exchange with Jacobs and Handler-Jacobs:

> THE COURT: As part of your sentence, I have the power to order you to make restitution to anyone who was injured as a result of your criminal conduct, and I can also order you to forfeit certain property to the [G]overnment. Do you understand that, Mr. Jacobs?
>
> DEFENDANT MICHAEL JACOBS: I do, your Honor.
>
> THE COURT: Do you understand that, Ms. Jacobs?
>
> DEFENDANT RUBY HANDLER-JACOBS: Yes, your Honor.

(Plea Hearing Tr. (Dkt. No. 158) at 17:15-22)

## IV. SENTENCING PROCEEDINGS

### A. Defendant Jacobs

Jacobs' Presentence Investigation Report ("PSR") states that "[t]he Government has compiled a list of victims who have been identified and correlating loss amounts." (Jacobs PSR (Dkt. No. 181) at 40) Although the PSR reports that the Government would seek $15.3 million in restitution, at sentencing the Government reduced its requested restitution order to $14 million. (Jacobs PSR (Dkt. No. 181) at 35; Jacobs Sent. Tr. (Dkt. No. 205) at 4:8-15)

On May 17, 2018, this Court sentenced Jacobs to three years' imprisonment and three years' supervised release (Dkt. No. 194), and ordered Jacobs to pay restitution in the amount of $14 million pursuant to an Order of Restitution. (Jacobs Order of Restitution (Dkt. No. 195)) Paragraph 3 of the Order of Restitution reads as follows:

> **Sealing**. Consistent with 18 U.S.C. §§3771(a)(8) & 3664(d)(4) and Federal Rule of Criminal Procedure 49.1, to protect the privacy interests of victims, the Schedule of Victims attached hereto shall be filed under seal, except that copies may be retained and used or disclosed by the Government, the Clerk's Office, and the Probation Department, as needed to effect and enforce this Order, without further order of this Court.

(Id. ¶ 3)

At Jacob's sentencing, the Court asked defense counsel whether Jacobs had any objection to the Order of Restitution:

> THE COURT: . . . It is my intention to [enter] the order of restitution submitted by the [G]overnment which provides for restitution in the amount of $14 million to eight victims of the Cit[ies] Upliftment Program fraud scheme. Mr. Robin, do you have any objection to the restitution order submitted by the [G]overnment?
>
> MR. ROBIN: No, your Honor. . . .

(Jacobs Sent. Tr. (Dkt. No. 205) at 33:10-16)

**B. Defendant Handler-Jacobs**

Handler-Jacobs' PSR states that "[t]he Government has compiled a list of victims who have been identified and correlating loss amounts," and that the total loss amount is "at least $15.3 million." (Handler-Jacobs PSR (Dkt. No. 182) at 33, 38)

On September 14, 2018, this Court sentenced Handler-Jacobs to two years' imprisonment and three years' supervised release (Dkt. No. 236), and ordered Handler-Jacobs to pay restitution in the amount of $14 million pursuant to an Order of Restitution. (Handler-Jacobs Order of Restitution (Dkt. No. 237)) Paragraph 3 of the Order of Restitution reads as follows:

> **Sealing**. Consistent with 18 U.S.C. §§3771(a)(8) & 3664(d)(4) and Federal Rule of Criminal Procedure 49.1, to protect the privacy interests of victims, the Schedule of Victims attached hereto shall be filed under seal, except that copies may be retained and used or disclosed by the Government, the Clerk's Office, and the Probation Department, as needed to effect and enforce this Order, without further order of this Court.

(Id. ¶ 3)

At Handler-Jacob's sentencing, the Court asked defense counsel whether Handler-Jacobs had any objection to the Order of Restitution:

> THE COURT: . . . The [G]overnment has submitted a proposed order of restitution. That proposed order provides for restitution in the amount of $14 million to eight victims of the Cities Upliftment Program fraud scheme. Mr. Gombiner, do you have any objection to the order of restitution?
>
> MR. GOMBINER: No.

(Handler-Jacobs Sent. Tr. (Dkt. No. 234) at 40:16-22)

## DISCUSSION

### I. WAIVER

#### A. Applicable Law

"The enforceability of an appellate waiver made 'knowingly, voluntarily, and competently' is a longstanding principle of Second Circuit law." United States v. Bilal, 941 F.Supp.2d 397, 402 (S.D.N.Y. 2013) (quoting United States v. Riggi, 649 F.3d 143, 147 (2d Cir.2011) (internal quotation omitted)) (citing United States v. Hernandez, 242 F.3d 110, 113 (2d Cir. 2001) (per curiam). "Otherwise, the plea bargaining process would quickly be rendered meaningless." Id. (citing United States v. Salcido–Contreras, 990 F.2d 51, 53 (2d Cir. 1993). "Thus, a knowing and voluntary waiver can preclude a defendant's right to challenge a Guidelines sentence, or to oppose an order of restitution contemplated by a plea agreement." Id. (citing United States v. Johnson, 347 F.3d 412, 414 (2d Cir. 2003); United States v. Pearson, 570 F.3d 480, 485 (2d Cir.2009) (per curiam)) (internal citations omitted). "Waivers of the right to collaterally attack a sentence are enforceable under the same principles as a waiver of a right to file a direct appeal." Id. (citing Garcia–Santos v. United States, 273 F.3d 506, 509 (2d Cir. 2001)).

"Notwithstanding such waivers, a petitioner may challenge the 'constitutionality of the process by which he waived those rights.'" United States v. Peterson, 896 F.Supp.2d 305, 311 (S.D.N.Y. 2012) (quoting Hernandez, 242 F.3d at 113). For example, "an appeal waiver tainted by ineffective assistance is not enforceable." Hunter v. United States, 608 U.S. 713, 724 (2026); see also Peterson, 896 F.Supp.2d 305, 311 ("[W]aivers secured without the effective assistance of counsel may be unenforceable.").

**B. Analysis**

Docket entries 196, 238, and 230 are the Schedules of Victims attached to the Orders of Restitution for Michael Jacobs, Ruby Handler-Jacobs, and their co-defendant, Lawrence Lester, respectively. Each Schedule of Victims was attached to the Order of Restitution, and lists the names, addresses, and specific amounts owed to each victim. (See Dkt. Nos. 195, 237) Contrary to Defendants Jacobs and Handler-Jacobs' claims, docket entries 196, 230, and 238 do not contain victim impact statements.

Jacobs and Handler-Jacobs argue, however, that docket entries 196, 238, and 230 – the Schedules of Victims – should be unsealed because they "did not have all of these documents when they pled and [were] subsequently sentenced," in violation of their Sixth Amendment right to confrontation.[1] (Defs. Mot. to Unseal (Dkt. No. 331) ¶ 10) In their plea agreements, however, both Defendants "agree[d] to make restitution in an amount ordered by the Court in accordance with Title 18, United States Code, Section[s] 3663, 3663A, and 3664." Defendants also acknowledged in their plea agreements that their offense involved ten or more victims, and had resulted in a loss to victims of between $9.5 million and $25 million. (Jacobs Plea Agmt. at 1-2; Handler-Jacobs Plea Agmt. at 1-2) And at the joint plea hearing, the Court reiterated to Defendants that it had the authority to order Defendants "to make restitution to anyone who was injured as a result of your criminal conduct," and both Defendants acknowledged that they were aware that they might be required to make restitution to their victims. (Plea Hearing Tr. (Dkt. No. 158) at 17:15-22)

---

[1] To the extent Defendants seek access to the Schedule of Victims attached to co-defendant Lester's Order of Restitution (Dkt. Nos. 229, 230), they have not articulated any basis for that application.

Moreover, the PSRs for the Defendants state that the Government intends to seek restitution from the Defendants on behalf of a compiled list of victims. (Jacobs PSR (Dkt. No. 181) at 40; Handler-Jacobs PSR (Dkt. No. 182) at 38) And before imposing sentence, the Court advised both Defendants of its intention to sign orders of restitution submitted by the Government, requiring the Defendants to make restitution to "eight victims" in the amount of $14 million. (Jacobs Sent. Tr. (Dkt. No. 205) at 33:10-16; Handler-Jacobs Sent. Tr. (Dkt. No. 234) at 40:16-22) The names and contact information for the eight victims were set forth in a "Schedule of Victims" attached to each Order of Restitution executed by the Court at sentencing. As discussed above, after the Court stated that it intended to sign the orders of restitution, the Court asked counsel for each Defendant whether there was any objection to the proposed order of restitution. Counsel for Jacobs and Handler-Jacobs stated that they had no objection to the proposed orders of restitution. (Jacobs Sent. Tr. (Dkt. No. 205) at 33:16; Handler-Jacobs Sent. Tr. (Dkt. No. 234) at 40:22)

In sum, Defendants were aware at the time of their guilty pleas, prior to sentencing, and at sentencing that they would be required to make restitution to the victims of their fraud scheme. The list of victims was not hidden from them or their attorneys – it was attached to the Orders of Restitution submitted by the Government and executed by the Court at sentencing. And when this Court asked defense counsel at sentencing whether Defendants had any objection to the proposed orders of restitution, defense counsel answered "no." Given these circumstances, the Court concludes that Defendants knowingly and voluntarily waived their right to challenge the Orders of Restitution and accompanying Schedules of Victims. See United States v. Shi Hui Sun, Nos. 09 Cr. 778 (KBF), 12 Civ. 4776 (KBF), 2013 WL 1947282, at *3-6 (S.D.N.Y. May 8, 2013) (defendant knowingly and voluntarily waived his right to challenge

restitution order of $2,132,240 where plea agreement (1) required defendant "to make restitution in an amount to be specified by the Court," (2) set forth a stipulated range of loss between $1,000,000 and $2,500,000, and (3) required defendant to waive his rights to appeal and collateral attack); see also King v. Cunningham, 442 F. Supp. 2d 171, 188 (S.D.N.Y. 2006) (finding that defendant "waived his right to confront any witnesses against him" where trial court told the defendant "at the plea hearing that 'when you plead guilty . . . you give up your trial rights' and clearly indicated that among those rights was the 'right to confront the witnesses against you'").

Defendants argue, however, that their attorneys did not "inform[] [them] that they had the right to confront their accusers or receive all of the documents submitted by the alleged victims." (Defs. Mot. to Unseal (Dkt. No. 331) ¶ 10) The Court construes this argument as an allegation that Defendants did not receive effective assistance of counsel, because they were not informed of their Sixth Amendment right to confront witnesses. See Smith v. Arizona, 602 U.S. 779, 783 (2024) ("The Sixth Amendment's Confrontation Clause guarantees a criminal defendant the right to confront the witnesses against him").

An ineffective assistance of counsel claim has two components. See Strickland v. Washington, 466 U.S. 668, 687 (1984). "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. "Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the

defendant of a fair trial, a trial whose result is reliable." Id.; see also United States v. Peterson, 896 F.Supp.2d 305, 312 (S.D.N.Y. 2012).[2]

As an initial matter, Defendants' claim that they did not receive effective assistance of counsel – because they were not informed of their right to confront witnesses – is directly contradicted by the record. During Defendants' joint Rule 11 proceeding, Court explicitly informed the Defendants of their constitutional right to confront the witnesses against them, both verbally and in writing:

> THE COURT: I now must explain to [] each of you certain constitutional rights that you have. These are rights you will be giving up if you enter a guilty plea. Listen carefully to what I'm about to say. If you don't understand something, stop me, and your attorneys will explain the matter to you more fully.
>
> . . . .
>
> THE COURT: If there were a trial, you would each have the right to see and hear all of the witnesses against you, and your attorneys could cross-examine them. You would have a right to have your attorneys object to the [G]overnment's evidence and to offer evidence on your own behalf if you so desired. You would have the right to have subpoenas issued to compel witnesses to testify in your defense. Do you understand that, Mr. Jacobs?
>
> DEFENDANT MICHAEL JACOBS: I do, your Honor.
>
> THE COURT: And do you understand that, Ms. Jacobs?
>
> DEFENDANT RUBY HANDLER-JACOBS: Yes, your Honor.

(Plea Hearing Tr. (Dkt. No. 158) at 10:6-11, 11:23-12:8)

At the Rule 11 proceeding, each Defendant also confirmed that they had signed a written Advice of Rights form prior to the proceeding. This Court marked the executed Advice of Rights forms as Exhibits 1 and 2 to the Rule 11 proceeding. (Id. at 3:6-18) In signing the

---

[2] As discussed below, in the context of a guilty plea, a defendant alleging ineffective assistance of counsel is obligated to show that the "result of the proceeding would have been different." (Id. at 312)

Advice of Rights forms, Defendants acknowledged the following: "I understand that if I plead not guilty to any count or counts in the indictment or information . . . I would be entitled, through my lawyer, to confront and cross-examine all witnesses against me. . . ." (Plea Hearing, Exs. 1 and 2) In sum, the Defendants were each informed of (1) their right to confront the witnesses against them; and (2) the fact that they were waiving this right by pleading guilty.

Moreover, Defendants' argument – that they were denied effective assistance of counsel because they were not advised of their right to confront the individuals listed in the Schedules of Victims – has no basis in law. As an initial matter, there is no evidence that the Government intended to call as witnesses – at a trial of the Defendants or in any other proceeding – any of the individuals listed in the Schedules of Victims. And even where an individual is expected to be a witness at trial, "[a] defendant is not automatically entitled as a matter of right or under the Federal Rules of Criminal Procedure to a list of the names and addresses of the Government's witnesses." United States v. Mandell, 710 F. Supp. 2d 368, 384 (S.D.N.Y. 2010) (citing United States v. Ojeikere, 299 F. Supp. 2d 254, 258 (S.D.N.Y. 2004)). And while district courts have discretion to order pretrial disclosure of the identity of the Government's witnesses where a defendant "makes 'a specific showing that disclosure [is] both material to the preparation of his defense and reasonable in light of the circumstances surrounding his case,'" Ojeikere, 299 F.Supp.2d at 258 (emphasis in Ojeikere) (quoting United States v. Cannone, 528 F.2d 296, 301 (2d Cir. 1975)) (citing United States v. Bejasa, 904 F.2d 137, 139-40 (2d Cir. 1990)), "'an abstract, conclusory claim' by a defendant that such disclosure is necessary is not sufficient." Id. (quoting Cannone, 528 F.2d at 301-02). Here the Defendants have not provided any explanation as to why disclosure of the names and addresses of their

victims is necessary or appropriate at this late date – more than eight years after their guilty pleas and sentencings, and after they have served their sentences.

Finally, the Orders of Restitution and the attached Schedules of Victims were prepared and submitted in connection with sentencing. "Both the Supreme Court and [the Second Circuit] . . . have consistently held that the right of confrontation does not apply to the sentencing context. . . ." United States v. Martinez, 413 F.3d 239, 242 (2d Cir. 2005) (citing Williams v. Oklahoma, 358 U.S. 576, 584 (1959)); see also United States v. Cherry, 541 F. Supp. 3d 407, 425 (S.D.N.Y. 2021). Accordingly, Defendants were not denied effective assistance of counsel when their attorneys did not advise Defendants of their right to confront the individuals listed in the Schedules of Victims prior to sentencing, because no such right exists at sentencing.

The Court concludes that Defendants' waivers of their right to appeal or to collaterally attack their sentences were made knowingly and voluntarily, and that these waivers are enforceable.

## II. DEFENDANTS' APPLICATION FAILS ON THE MERITS

As discussed below, even if Defendants had not waived their right to challenge the restitution order, their application to unseal the Schedules of Victims fails on the merits.

### A. Motion to Unseal

#### 1. Applicable Law

The Second Circuit has articulated a three-step process for determining whether documents should be placed under seal. A court must first determine whether the presumption of public access attaches to the documents at issue. A presumption of public access attaches to any item that constitutes a "judicial document" – i.e., an "'item . . . relevant to the performance of the

judicial function and useful in the judicial process.'" Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 119 (2d Cir. 2006) (quoting United States v. Amodeo, 44 F.3d 141, 145 (2d Cir. 1995) ("Amodeo I")). If the court determines that a document for which sealing is sought is a "judicial document," the court must then determine the weight of the presumption of access. "'[T]he weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts.'" Id. (quoting United States v. Amodeo, 71 F.3d 1044, 1049 (2d Cir. 1995) ("Amodeo II")). "'Generally, the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance.'" Id. (quoting Amodeo II, 71 F.3d at 1049). Finally, after determining the weight of the presumption of access, the court must "'balance competing considerations against it.'" Id. at 120 (quoting Amodeo II, 71 F.3d at 1050). "Such countervailing factors include but are not limited to 'the danger of impairing law enforcement or judicial efficiency' and 'the privacy interests of those resisting disclosure.'" Id. (quoting Amodeo II, 71 F.3d at 1050).

**2. Analysis**

Defendants argue that the Schedules of Victims should be unsealed because their "Sixth Amendment rights, prior to pleading, were apparently infringed upon by not being provided all of the victim impact statements and other documents now held under seal." (Defs. Mot. to Unseal (Dkt. No. 331) ¶ 11)

As an initial matter, the Schedules of Victims that Defendants seek do not contain any "victim impact statement[s]." (Id. at 4-5) To the contrary, the Schedules of Victims contain only the names and addresses of the victims, along with the specific amounts of restitution that

they are entitled to as a result of being victimized by Defendants' fraud scheme. (See Dkt. Nos. 195, 229, 237)

Moreover, Defendants have not provided any reason or justification why the unsealing of the Schedules of Victims is necessary or appropriate at this late date. As discussed in the Orders of Restitution, the Schedules of Victims are sealed in order "to protect the privacy interests of victims." (Jacobs Order of Restitution (Dkt. No. 195) ¶ 3; Handler-Jacobs Order of Restitution (Dkt. No. 237) ¶ 3) Courts in this District have long found "[t]he privacy and reputation of crime victims [to be] a countervailing interest to the presumption of public access." United States v. Avenatti, (S1) 19 Cr. 373 (PGG), 2020 WL 70952, *5 (S.D.N.Y. Jan. 6, 2020) (citing United States v. Cohen, 366 F. Supp. 3d 612, 625 n.4 (S.D.N.Y. 2019); United States v. Belfort, No. 98-CR-0859, 2014 WL 2612508, at *3 (E.D.N.Y. June 11, 2014). Defendants do not explain why – more than eight years after their sentencings, and after their release from custody and the completion of their terms of supervised release – their interest in the identities of the individuals listed in the Schedules of Victims outweighs those individuals' privacy interests.

To the extent Defendants seek the disclosure of the names and addresses of their victims to support a challenge to their Orders of Restitution, any such argument would not be persuasive. As the court stated in Vitrano v. United States, "[t]here is no nexus between the amount [the defendant] is required to pay, based on the known damages from his crime, and the names of his individual victims or the amount each of them will ultimately receive." Vitrano v. United States, No. 06 Civ. 6518 (JCF), 2009 WL 1011582, at *8 (S.D.N.Y. Apr. 14, 2009) (rejecting a defendant's argument that the obligation to pay restitution "cannot go into effect until he receives a list of the restitution recipients").

Absent any reason to believe the victims' privacy interests have dissipated over time – and absent any explanation as to why Defendants' need for their victims' names and addresses trumps the victims' privacy interests at this late date – Defendants' arguments for unsealing are not persuasive.

**CONCLUSION**

For the reasons stated above, Defendants' motion to unseal docket entries 196, 230, and 238 and "any related documents" (see Dkt. No. 331) at 6) is denied. Defendants' request to convert their motion into a "Motion to Compel to Provide Defendants With Access" is likewise denied. The Clerk of Court is directed to terminate the motion (Dkt. No. 331).

Dated: New York, New York
September 28, 2026

SO ORDERED.

Paul G. Gardephe
United States District Judge